

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV–16–21

| | | |
|---|---|---|
| SUSANNAH BAXTER | | **Opinion Delivered** December 7, 2016 |
| | APPELLANT | |
| V. | | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04CV-14-775-6] |
| JOHN WING | | HONORABLE DOUG SCHRANTZ, |
| | APPELLEE | JUDGE |
| | | REVERSED |

## RITA W. GRUBER, Judge

This case involves a dispute about life-insurance proceeds received by Susannah Baxter upon the death of her stepfather, Bazel Winstead. Susannah's brother, John Wing, sued her, contending that the policy proceeds were intended to be split equally between Susannah, John, and their two siblings, Stephen Wing and Lanie Martin. The Benton County Circuit Court entered an order imposing a constructive trust on the proceeds after finding that Bazel and Susannah had entered into an oral contract requiring Susannah to divide the proceeds with her siblings. Susannah has appealed from that order. We hold that the court's finding of an oral contract is clearly erroneous, and we reverse the circuit court's order.

John, Stephen, Lanie, and Susannah are the stepchildren of Bazel Winstead, who married their mother, Betty, in 1988. At that time, Susannah was in eighth grade; the other three children were grown, married, or out of the house. Susannah was the only sibling who grew up with Bazel acting as her father. In January 2011, Betty died. Shortly thereafter,

Bazel began updating his estate plan. In February 2011, Bazel updated one of his life-insurance policies, naming Susannah as his sole beneficiary. In March 2011, he updated his will, leaving his estate to the four siblings "share and share alike." In April 2011, he applied for additional life insurance and named Susannah as the sole beneficiary. In the spring of 2011, Bazel called Susannah and told her what he had done with his estate. According to Susannah, he told her that the will divided the estate four ways and that the life insurance was in Susannah's name only. She said that he told her to "just share some with your brothers and sister."

Bazel died on September 16, 2013. The proceeds from his life-insurance policies, in the total amount of $208,004.74, were eventually all paid to Susannah. The parties dispute exactly what conversations occurred between the siblings after Bazel's death, but they do agree that Susannah said that she would share some of the proceeds with her siblings. John believed it was incumbent on Susannah to divide the proceeds evenly: 25 percent to each sibling. Susannah believed that the proceeds were hers and that Bazel's instructions to her were to "share some" as she chose. John sent numerous messages to Susannah inquiring about her intent regarding the life-insurance proceeds and eventually filed a complaint against her. He initially filed the lawsuit in Garland County on February 7, 2014, but it was transferred to Benton County on June 6, 2014.

The circuit court held a bench trial in March 2015 at which testimony was given by all four siblings; Susannah's husband, Josh Baxter; and the father of the four siblings, Franklin Wing. John testified first. He said that he was in his late twenties when his mother married

Bazel and that he had never lived near them. He said that he lived in Austin, Texas, and had two grown children. He admitted that, before Bazel died, John had no knowledge about Bazel's estate plan, no idea whether he had life insurance, and no conversation with Bazel or any of his siblings about either subject. He testified that he and Bazel had not been close. He said that he had learned about the life insurance the day after Bazel's funeral when Lanie told him that Susannah had approached her and suggested they not tell John about the life insurance and split it three ways. He also referred to a conversation among the four siblings during lunch at Subway in which Susannah had told the siblings that everyone would get some of the proceeds. He admitted that he had continued to email and text Susannah and Josh, stating that he was waiting on his "portion" and asking if Susannah was going to follow Bazel's instructions. John said he did not dispute that Susannah was the named beneficiary on all of the life-insurance policies, but he had been told by Lanie and by his father, Franklin, that Bazel had given Susannah specific instructions regarding those proceeds. His opinion was that Susannah had "some sort of oral contractual agreement to distribute the life insurance equally at the specific instruction of Mr. Winstead," although he admitted that he did not have first-hand knowledge about those instructions. He said that Lanie had not told him about any specific instructions but had merely said that they would all "be taken care of."

Franklin Wing testified that he had a very close relationship with his son John and was not at all close to his daughter Susannah. He explained his relationships on a scale of 1 to 10 as being a 10 with John, an 8 or 9 with Lanie, and a –3 with Stephen and Susannah. He testified that Susannah had called him several times after Bazel's death to discuss the insurance

3

policy. He said that he had asked her if Bazel had given her any instructions and then had told her that she should follow them. Franklin testified that Susannah had said that Bazel told her to divide the proceeds "evenly and fairly." He said one time when he had spoken with Susannah, she told him that Bazel told her to divide the insurance proceeds just as his will was dividing the property. He said that he had emailed Susannah in January and pleaded with her to follow Bazel's instructions and to "do the moral and ethical thing." Franklin admitted that he had no first-hand knowledge about the insurance policy and that he had never spoken with Bazel about his estate or life insurance.

Lanie testified that, after their mother passed away, Bazel had told her that they would all "be taken care of." She said that she assumed he meant both the will and the life insurance, but she admitted that this was Bazel's only comment to her about it and that he did not give her any specifics. She testified that Susannah had never told her what Bazel wanted her to do with the life-insurance money. She said that she did tell John about Susannah's comments to split the money three ways and leave John out but that she did not take Susannah's comment to mean that, if John were included, the money would be split four ways. She said, "It just didn't sit well with me. We are four children. It should be split four ways." She testified that she now interpreted Susannah's comments to mean that she was obligated to split the money four ways. She said that she did not have any other conversations with Susannah about the life insurance.

Susannah testified that she had lived with her mother and Bazel from eighth grade until she was twenty-three years old except for her senior year in high school, when she lived

with Lanie in order to graduate with her friends in Hot Springs. She said that she moved back in with her parents when she was twenty-five and lived with them until she was twenty-eight. She testified that when her mother died in 2011, Susannah was the named beneficiary of a life-insurance policy in the amount of $20,000 to $25,000. She said that after the funeral expenses had been paid, she gave the remainder of the money to Bazel for home repairs.

Susannah testified that Bazel called her in the spring of 2011 and told her, "This is what I've done." He said that he had taken care of burial insurance, split his property equally among the four siblings in his will, and left life insurance in Susannah's name. He told her to "share some" with her siblings. She said that she did not respond to this, because it was a declarative statement and not a question seeking a response. She also testified that she was not clear after Bazel died whether the life-insurance proceeds were part of probate. When the siblings had lunch at Subway before they met with the estate attorney, she told them that everyone would get some of the life-insurance proceeds. She did not indicate any particular amount. She said that she had always intended to share some with her siblings, as Bazel had instructed. She testified that the estate attorney clarified after lunch that the proceeds belonged to Susannah and were not part of probate.

Susannah testified that she had spoken several times with Franklin and that he had told her to split the life insurance "just like the will said." She testified that Franklin did most of the talking in their conversations and that he "spent a lot of time trying to explain to me how I could split it up evenly." She said that he kept telling her that she was wrong and acting like

she was confused. She said that she had been frustrated talking to him and had felt like he was not listening to her. She testified that Franklin's version of their conversations was "completely false."

Stephen testified that he had been appointed by Bazel as the executor of the estate sometime in early 2011. He testified that Bazel had never told him anything specific about the will, talked with him about life insurance, or given any specific instructions to him. He said that he had found no instructions or notes contrary to the will or life-insurance policy after Bazel's death. He described Susannah as Bazel's only "dependent . . . his daughter" and testified that the other siblings did not have a "real relationship" with Bazel. He said that it made "perfect sense" to him that Bazel had left the life insurance to Susannah and her young family.

On June 22, 2015, the circuit court entered an order finding that Bazel and Susannah had entered into an oral contract whereby, upon receipt of the insurance proceeds, Susannah was to divide the proceeds evenly among her and her three siblings. The court found that, by not dividing the proceeds, Susannah had breached the contract. Thus, the circuit court imposed a constructive trust on the proceeds and awarded judgment to John against Susannah in the amount of $52,001, one-fourth of the total proceeds. The court also awarded him $20,000 in attorney's fees.

Susannah appeals the circuit court's order, arguing that the court clearly erred in finding that she and Bazel had entered into an oral contract and that it improperly imposed a constructive trust on the proceeds. Our standard of review on appeal from a bench trial is

whether the circuit court's findings were clearly erroneous or clearly against the preponderance of the evidence. *Foundation Telecomm., Inc. v. Moe Studio, Inc.*, 341 Ark. 231, 238, 16 S.W.3d 531, 536 (2000). We defer to the circuit court's credibility assessments. *Id.* at 240, 16 S.W.3d at 537. Because the court's imposition of a constructive trust was based on its finding of an oral contract, we review that issue first.

The question before us is whether Bazel and Susannah entered into an oral contract pursuant to which she agreed to distribute the life-insurance proceeds equally among her and her siblings after Bazel's death in exchange for his promise to refrain from revoking his beneficiary designation. The parties do not dispute that it was Bazel's expressed desire for Susannah to share some of the life-insurance proceeds with her siblings after his death. They do dispute exactly how much he told her to share and whether he "instructed" her to divide the money equally or "suggested" that she simply share some of the money. A resolution of this dispute would be neither relevant nor helpful, however, to the basic issue before us. Because, even if Susannah had a moral obligation to do what her stepfather asked of her, she did not have a legal obligation to do so under the facts of this case.

We turn to the law governing contracts. It is black-letter law that this court cannot make a contract for the parties but can only construe and enforce the contract that they have made. *City of Dardanelle v. City of Russellville*, 372 Ark. 486, 491, 277 S.W.3d 562, 566 (2008). The traditional definition of a "contract" is "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." 1 Richard A. Lord, *Williston on Contracts* § 1:1 (4th ed. 2007). A

7

promise is "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *Id*. § 1:2. Our supreme court has stated that the purpose of the law of contract is to see that promises are performed. *Bankston v. Pulaski Cty. Sch. Dist.*, 281 Ark. 476, 479, 665 S.W.2d 859, 862 (1984).

Under Arkansas law, a contract must include the following essential elements: (1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual agreement, and (5) mutual obligation. *City of Dardanelle*, 372 Ark. at 490, 277 S.W.3d at 565–66. Mutual promises may constitute consideration, each for the other. *Capel v. Allstate Ins. Co.*, 78 Ark. App. 27, 40, 77 S.W.3d 533, 541 (2002). While mutual promises will sustain a contract, there is no valid agreement if there is no promise by one party as a consideration for the other's promise. *Essential Accounting Sys., Inc. v. Dewberry*, 2013 Ark. App. 388, at 6, 428 S.W.3d 613, 617.

According to the law set forth above, the foundation of a contract is a promise. Here, John argues that even though Susannah was already the designated beneficiary of the life-insurance policies at the time of the alleged contract, Bazel had the ability to change the beneficiary at any time. Thus, he claims, Bazel's promise to refrain from changing the beneficiary was sufficient consideration in exchange for Susannah's promise to divide the proceeds. While a true-enough proposition, the court did not make this finding. Rather, the circuit court determined that Bazel and Susannah had entered into an oral contract based on its finding credible the testimony that Bazel's "instructions were to divide the insurance

proceeds evenly." While it may very well be a clear expression of Bazel's intent, his instructions do not constitute an oral contract. The court did not find, and the evidence does not support a finding, that either Bazel or Susannah made any promise at all. John's witnesses testified that Bazel merely instructed Susannah to divide the proceeds evenly. No one testified that Bazel expressed any intention or desire to revoke his beneficiary designation if Susannah did not agree to these instructions. Moreover, no one testified that Susannah made any promise to Bazel to follow his instructions. Accordingly, we hold that the circuit court clearly erred in finding that Bazel and Susannah entered into an oral contract regarding distribution of the life-insurance proceeds.

Given our holding herein, we reverse the circuit court's order in its entirety, including the imposition of a constructive trust and the award of costs and attorney's fees.

Reversed.

HARRISON and HOOFMAN, JJ., agree.

*Matthews, Campbell, Rhoads, McClure & Thompson, P.A.*, by: *Sarah L. Waddoups*, for appellant.

*Reece Moore Pendergraft LLP*, by: *B.R. Price*, for appellees.